Mr. Chair, good to see you. It's been a while. Good morning. Battling a bit of a cold, so excuse me. Pardon my hoarse voice. Good morning. May it please the Court. I'm Todd Share on behalf of the appellant Leonardo Franqui on Council. Good morning. This morning we are here on the appeal of the denial of Mr. Franqui's Atkins claim. It's our contention that the Court should conduct plenary review of the claim as it's not bound by 20 U.S. Code 2254d either 1 or 2. All right. I want to understand this. Honestly, I want to understand your argument. Is it your contention that Supreme Court precedent clearly established federal law required the Florida Supreme Court to review the determination of the Atkins claim de novo? I don't know and I don't think I've cited a case for that particular proposition. Your argument as I understand it is that it had to conduct an independent assessment and not employ what it appears to me to have been the ordinary standard of review of whether the district court's finding was supported by the record. So, help me understand that. My argument concerning the Florida Supreme Court's employment of a competent substantial evidence test is tied up into, you know, an ID claim really has two components obviously. Factual findings and a legal analysis. And here, because the Florida Supreme Court conducted a competent substantial evidence review, which it has not done in other similar cases. For example, in Hall and I think in Herring cases cited in my brief, they've actually engaged with the evidence. Here, the lower court, the circuit court, did a . . . Is that an error of . . . are you saying that the standard of review that they employed was one that was . . . should . . . that Florida law required to be different? I'm trying to understand from federal habeas perspective. Sure. I think what I'm getting at with that argument is that because the trial court made a number of findings which we submit are unreasonable in light of the facts and the Florida Supreme Court did not engage with the facts. It just deferred to the circuit court. There was no venue. This kind of gets to the crux of it for me. It is . . . it seems to me that there's . . . that the state courts are free to employ ordinary standards of review for these kinds of claims. That there's nothing in federal law that would have required a different form of a standard of review. If that's true, then it seems hard for you to say that there's been some kind of unreasonable determination of the facts. Well, the court is required in habeas to look at . . . of a federal constitutional claim unless the petitioner can establish D-1, contrary to or in a reasonable application of federal law, or to an unreasonable determination of fact in light of the record. In terms of the D-2 and to a certain extent the D-1 analysis, because one of the arguments I'm making is that the Florida Supreme Court didn't even address Atkins in its 2020 opinion, much less engage with it. My argument about the way that Florida Supreme Court handled this issue is that it just deferred to the circuit court, the state circuit court's findings, without any analysis of the arguments that those findings were unreasonable in light of the record. Of course, the district court then in turn really did the same thing. I mean, the district court's analysis of the Atkins claim really is sort of the last two pages of the order, really just as the Florida Supreme Court says. I have to defer to that. And so there's been no court that's looked at the record in this case to undermine what we determined to be unreasonable facts in light of the record presented and the evidence presented at the evidentiary hearing. Otherwise, it's just a rubber stamp, which we know, of course, that's not your role. But even if you're correct on the first level analysis, assume that what you're saying is that the Florida Supreme Court's decision, I don't want to put words in your mouth, so if I'm wrong, just correct me. You're saying that the Florida Supreme Court's decision in 2020 was no better than a summary affirmance on the mental disability issue, right? Essentially, yes. If that's correct, and I'm not sure that it is, but if that's correct, what you do is you look through the summary affirmance to the previous reasoned state court decision, which would be the state circuit court decision, right? Correct. Okay. Putting AEDPA completely aside for purposes of this question, mental disability is a question of fact. So even if you treat the Florida Supreme Court's 2020 decision as a summary affirmance and you look through and even if you put AEDPA aside, I'm not suggesting we can, but even if you put AEDPA aside, what you're left with is clear error review of the state circuit court decision. Yes, you're left to review, right? I mean, just as you would look at as if the Florida Supreme Court had made those findings.  And so my question to you, assuming all of those things, it seems to me that this is the sort of record where there is evidence that could have gone two different ways depending on how the fact finder resolved the evidence and what inferences were drawn, right? For example, on the IQ scores, if the fact finder had done the standard error of measurement and done the Flynn effect, you'd be in a much better position with regards to the first prong of mental disability. Same thing with the adaptive prong. If the fact finder had viewed certain parts of the record differently, the outcome might have been different. But if clear error review is for plausibility, that's one of the ways the Supreme Court has described it, why do you think that the state circuit court's decision here was not plausible in light of the record? Because there are many findings, key findings that are just flatly wrong, for example, and that has to be reviewed. Wrong or debatable? Unreasonably wrong. Okay, tell me the most glaring one that you think. For example, as to prong one, Judge Venzer found that Mr. Franke's lowest IQ score across the boards, taking into consideration the standard error of measure, there was no, I don't think she considered the Flynn effect. 71. Was a 71. That's just not correct. The lowest score, as even Dr. Suarez, the state's expert, acknowledged, was in range, was the 75 from Dr. Block-Garfield's test and also his test on the WACE-4. She did a WACE-3. The range was 70. 75 was the full scale IQ and the range down was 70. So the lowest score, considering the standard error of measure in this case, was not a 71. It's a 70. But that doesn't get you too far because both of those put you at the level of mild intellectual disability, right? Well, mild intellectual disability is disability under the Eighth Amendment, according to Atkins. And even Atkins talks about, if you look to footnote five of Atkins, it talks about the estimation between 1% and 3% of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff score for the intellectual function prong of the mental retardation definition. So it's the 70 to 75 range, which is the key here. And the judge, I think, erroneously believing that a 71, you know, sort of like almost kind of pre-Hall thinking, which is that anything above a 70 is a cutoff. And that's just not the case here. But actually, the court did go on to consider, I mean, there was an evidentiary hearing, the court went on to consider the adaptive reasoning and all of that. And also there was evidence that he might have been malingering on the intelligence tests. So given that record, I guess, how can we find that the state court's factual findings were unreasonable, unreasonably wrong? Yes, obviously the record and the hearing and the evidence speaks for itself. But I think what I tried to focus in on my brief was the D2 problem, which is the unreasonable determination of fact. Although, if I can just add before I forget, that I think the 71 isn't something to be discounted because even under Atkins, that's a qualifying score. It didn't Dr. Suarez on that point, though, also testify that the confidence interval for that test was 71 to 80? On his test. Right, that's where the 71. That's the one he got where he scored a 75, right? Correct, he scored a 75 on two independent tests. And the confidence interval was 71 to 80. Why doesn't that support the district court's finding? Because Dr. Suarez also acknowledged on page 1263 of the Floorspring Court record that the confidence interval for Dr. Garfield's test was 70 to 80. And so my concern about this analysis was that this overall statement by the state circuit court that the lowest score, even assuming the number itself is all that critical, but the lowest score was 71 just isn't supported by the record because the actual lowest score considering the standard error measure is 70. But going back to your... Had the court, had the state circuit court stopped at prong one because it thought 71 was the lowest and said 71 is sort of it for you. If you're not any lower, I'm not going any further. But it went to the other two prongs. So tell me about prong number two. Why do you think there was clear error or unreasonable determination of facts with regards to prong two? So when you look at the state circuit court's portion of her order where she addresses prong two, I mean, first of all, there's three prongs of adaptive deficit analysis. There's the conceptual, the social, and I think academic or something. But I'm focusing really on the conceptual because I think that's what the judge found. That's where I believe the most errors were found is the judge, for example, says there was no evidence presented regarding Mr. Franke's preschool experience except his mother was absent and he did not know his father. But that's not supported by the record. That's an unreasonable determination of the facts. For example, there was a deposition or testimony of Mr. Franke's uncle presented into evidence. Mr. Franke's uncle testified at the original penalty phase who talked about his nephew's experience in school while in Cuba. He was in special classes while he was in Cuba. He was always considered slow even in school. And then he goes on to talk about how he considered him to be slow in understanding and also retarded. And this is all early on with Mr. Franke being a young child. Also, if you look to the school records, they're not addressed really at all in Judge Venzer's order except I think in the part where she talks about Dr. Toomer's testimony about Mr. Franke supposedly being a C student. The school records reflect that Mr. Franke was placed when he was in the Dade County public school system, came to the U.S., he was nine. When he was placed into the U.S., the Dade County school system, he was placed into remedial classes. And there's a number of entries there where he even got unsatisfactory grades in the remedial classes, which as the state brought out of the evidentiary hearing were in Spanish, which perhaps at the time would have been a more conversive language for Mr. Franke, although he'd been here at that point quite some time. But wasn't there also testimony that his ceasing education around the seventh grade or whatever was not due to grades? I mean, there was contrary testimony, too, if you could have, I guess, inferred it in a certain way. But wasn't there evidence that the state circuit court could have credited that his reasons for dropping out did not have to do with his poor grades and had to do with his wanting to do other things like be one of the guys, et cetera? There was testimony to that, yes. But what the circuit court failed to consider, I mean, when a judge reaches that kind of determination, obviously, to credit one side or the other, there has to be an engagement with both sides of the arguments. And so what we contend that Judge Benzer overlooked particularly was Dr. Toomer's testimony with respect to what had happened, was that Mr. Franke's younger brother had died suddenly as a child. And Dr. Toomer's testimony traces that death through Mr. Franke's academic and home life and the trauma that was going on at the time with mother being clearly mentally ill, his brother dying, he was in a new environment. And so all of that combined led to him dropping out of school, an academic problem. But certainly ID is not tied to academic achievement. They're two separate things. You also have, for example, in the school records that he was held back a year, where Dr. Suarez says he was never held back for a year. Dr. Suarez says, for example, Mr. Franke was never fired from a job when in fact, excuse me, Judge Benzer found that Mr. Franke had never been fired from a job when Dr. Suarez in fact conceded that he had been fired from a job. I think he was at the marina or something. And so I think what I was trying to get across in the brief is that there has to be a forum, and I think this is the forum, for a court to look and engage with all of this evidence, because Judge Benzer did not. The Floorspring Court did not. And the District Court did not. And so it's this sort of rippling effect of a failure to actually engage with this evidence that was present in the record, the school records, the uncle's testimony. It was testimony presented by the state that was even favorable from one of Mr. Franke's bosses about his, Mr. Franke's abilities while he was working as a lawn care worker or something, mowed lawns. So there's really a failure of engagement with any of the evidence here, which is this holistic type of evaluation. And so there's a domino effect here when you're sort of having to follow these erroneous, unreasonable fact findings throughout this process, where, you know, there has to be a point, and I think it's this court, to take a look at the facts that were presented to evaluate Judge Benzer's, what we submit to be unreasonable determinations of fact in light of the record. Prong three also. What do we make of the reliance on Mr. Franke's involvement in the planning of some of the crimes that he was convicted of? There was certainly evidence that Dr. Suarez talked about that, but I'd point the court to Brumfield v. Cain, where the Supreme Court talks about the fact that you can have some adaptive skills, but that doesn't override that you have adaptive deficits. And so it's just all part of the mix. And, you know, I'm not supposed to really get into, you know, Moore and Hall, but certainly Moore talks about, you know, the fact that the facts of the crime really are not a germane consideration when you talk about I.D. Right, but there was also evidence about the prior crimes, too, not just the crime that led to his death sentence, the prior robberies, for example. There was some, I believe Dr. Suarez did address all of that, of course. I mean, Dr. Suarez, you know, never found a capital defendant I.D. in his prolific experience, and that's one of the things we also pointed out, is, you know, he claimed to, for example, look at all the records in the case, but then never looked at the school records, things of that nature. He was, in our view, inattentive to look to information that may have been favorable to Mr. Frankie in what we submit was a bias toward the state. Do you think, again, without putting words in your mouth, that the State Circuit Court missed some things and got some other things wrong, and that leads, overall, to an unreasonable determination on the issue of mental disability? Well, I think the Circuit Court missed some things which led to the unreasonable determinations, in fact, because you can't look at what the court found without looking to what the court, not just, there's nothing here that I can think of that we're saying, well, she just, you know, she chose the wrong side. She chose to side with Dr. Suarez of the state as opposed to Mr. Frankie. There was just an absence of, in our view, a meaningful engagement with the actual evidence on some of these points, and so that's what led to the unreasonable determinations of fact, which, of course, have dogged the case since then. So we submit all of that, you know, and certainly I think Your Honor had mentioned, you know, if the judge had stopped at 71 and said no more, that would be a mistake. Yes, of course that would be a mistake. But what's also a mistake is just to sort of then correctly go on to the other two prongs, but then never evaluate. I mean, a 71 still would require an evaluation of prong two and prong three, but there was no what some of the courts have described as a holistic evaluation of how those three work in tandem, and prong three is a perfect example. If you look at the State Circuit Court's order on prong three, there's no analysis whatsoever really of prong three. All the court addresses is sort of a reengagement with the adaptive functioning determination she had made as to prong two, and so there was nothing that the court found, the State Circuit Court found, with respect to manifestation before the age of 18, which we submit the record is plentiful, ample, and unequivocal, and unrefuted in terms of certainly manifestation before the age of 18. I see I'm almost at the time for my rebuttal, so unless the court has any further questions, I'll relinquish. Thank you. Thank you. Ms. Lerner? Ms. Lerner. May it please the court, Lisa Marie Lerner with the Attorney General's Office for the State of Florida. Bottom line, Mr. Franke has not met his burden to demonstrate that he is intellectually disabled. Before the State Circuit Court, the court had six doctors' evaluations of Franke. Five of those doctors did not find him intellectually disabled. The only doctor who did find him intellectually disabled was Dr. Toomer, and interestingly enough, Dr. Toomer gave two IQ tests to Franke. On the normal test that is given, the WACE, he scored Franke at an 83. It was Dr. Block-Garfield and the original penalty phase trial who scored Franke at 75, and then Dr. Suarez, when he tested him, also got a 75. Dr. Taub did not diagnose Franke as intellectually disabled. He simply reviewed Dr. Block-Garfield's report, and he mistakenly said that the IQ range was 70 to 80. I say mistakenly because Dr. Suarez testified that the standard error of measurement is four below and five above. Also, the court had in front of it . . . Is that testimony accepted across the board medically, or that was a testimony in this case? Because I've certainly seen other records where the standard error of measurement is both five up and five down. That was the testimony in this case. There was no contrary testimony about the standard error of measurement? No. Dr. Taub said it was 70 to 80, and Dr. Suarez said it was 71 to 80. Dr. Suarez, as I understood it, testified that the confidence interval is usually down four, up five, or something like that. But, he also said it could be plus or minus five, but that in this case, as I understand it, where the score was 75, he testified the confidence interval was 71 to 80, which would be the down four, up five. That's correct, Your Honor. I mean, he did allow for what Judge Jordan is talking about, that it could be minus five, but in this case, he said it wasn't. Yes, and also, the state would put forth that there is no presumption that the standard error of measurement falls at the bottom of the range, and this court should not employ such a presumption, which is essentially what I believe Frankie is asking this court to do. Sorry, can you repeat that? I said there should be no presumption that the correct IQ falls at the bottom of the range, as opposed to somewhere in the range or even at the high end. What did the State Circuit Court say about that, if anything? The State Circuit Court didn't address that. I mean, unless you're asking us to draw an inference because of the way the case came out, but we're not deferring to an express factual finding. It would be different, I think, or maybe different, if the State Circuit Court had said, okay, the interval is 70 to 80, but taking all the evidence as a whole and all the experts' testimony, I think it's 73 or I think it's 77. We don't have anything like that, right? That's correct. We do not. It's just the range, and the State Circuit Court adopted the 71 to 80. But as this court is aware, the Circuit Court also went on to look at the adaptive functioning and noted that Frankie held a number of jobs, not just with his uncle, but with other employers, was married, had two children, supported his family, owned nine cars, was able to buy and sell things, managed his own money, did not require any day-to-day assistance with normal tasks, which intellectually disabled people may require or usually do require. Frankie groomed himself, he handled his own money, he paid his bills, and so on. I understand that the post-conviction court did rely on the evidence that he was the mastermind of this robbery and the other. Yes, it also considered that. And the Florida Supreme Court... Your opponent, your adversary says that that doesn't matter, that we're not supposed to consider that. Is that right? No, the State does not believe that that is a correct statement, especially in a situation like this, where you have a number of crimes that happen, including two separate death penalty cases. Where the testimony at the trials in both the murder cases was that Frankie was the one who planned it, who scoped out the scene, obtained the cars, and told the other participants what to do. And so I think it was valid for the circuit court to take that into consideration. And as this court pointed out, Hall and Moore are not retroactive to this particular case. Does that really matter here? Because, I mean... No, not really. As you acknowledge, the post-conviction court did a post-Hall analysis, right? Yes. And it seems to me that whether it was required to or not for our purposes is kind of beside the point, because it did. Yes, I agree. Additionally, addressing my opposing counsel's statement that the Florida Supreme Court did not engage in the record. The court did. It did not do an extensive analysis of the transcript facts, from the evidentiary hearing in 2017. But it did review that record, and it found that given the facts brought out at that evidentiary hearing, there was competent substantial evidence to support the lower court's finding that Frankie had failed to prove intellectual disability. And that is the standard that the state law sets out. Whether competent substantial evidence exists for the factual findings. Mr. Scheer says in part that at least some of the state circuit court's subsidiary factual findings were wrong. Do you want to talk about that? Well, I disagree with part of that. You disagree with part of it? I disagree. You said you disagree with part of that, and so I'm asking you, do you agree with part of that? Well, I agree with Mr. Scheer's analysis of the circuit court order. It did not really deal with the third prong. I agree that the circuit court, again, went into the adaptive functioning and deficits, and did not really address the onset before the age of 18. But what it said was, I thought, the post-conviction court said Frankie does not presently suffer from adaptive deficits, and his adaptive deficits as a minor appear to be the result of behavior or psychological issues, rather than an intellectual disability. It said that, right? That's a finding about the third element, isn't it? Yes, but it didn't really analyze it very much. It didn't have to, did it? No. For our purposes. Okay, so to the extent that you have an agreement, that's the agreement? Yes. That's it, otherwise you disagree. Why don't we go through the things that Mr. Scheer said that the post-conviction court got wrong, and why you disagree with him about that? For example, there was testimony from several of the experts about Frankie getting C's in 5th and 6th grade, and it was when he got to 7th grade that he began failing, and I believe had to repeat the 7th grade. But also, as Dr. Suarez pointed out, if you look at his attendance record for the 7th grade, he essentially stopped going to school, and was eventually expelled because he stopped going to school. And Frankie, in fact, told the doctors that the reason he failed 7th grade was he wanted to hang out on the street with the guys. And so that is not evidence of intellectual disability, that's evidence of a child misbehaving and ditching school. And so the circuit court could look at that and say that is not evidence of onset before the age of 18, nor is it evidence of intellectual disability making him quit school. Can I press you a little bit more on my question to you initially with regards to one of the factual findings? Yes. I don't know that it makes a difference, but I do want you to address it. The state circuit court said that there had been, this is a quote, that no evidence was presented regarding the defendant's preschool experience, except that his mother was absent and he did not know his father. Mr. Scher says that's just a wrong subsidiary determination of fact, because whether credited or not, there was testimony from the uncle about Mr. Frankie's behavior preschool. And so is Mr. Scher right about that subsidiary finding of fact? The uncle said that he was slow, yes. Okay, but that's evidence, preschool. The fact finder can discount that evidence, give it very little weight or whatever, but it's one thing. His point is that the state circuit court did not meaningfully engage with the evidence that he presented. And so, for example, the court says no evidence about preschool and that's wrong. So tell me why that's one of them. There are a couple of others that he pointed out, I'll go through those too, but tell me if he's right or wrong about that point. I think it would be fair to say the circuit court could say that essentially there was no evidence because you only got a comment saying that he was slow. And from my reading of the transcript, that testimony in his deposition covered a range of ages. Does that mean you're suggesting that the district court is implicitly giving that evidence little weight because it's so cryptic to say that he's slow? Is that what you're saying?  Okay, number two, the state trial court wrote that there was no evidence that Mr. Frankie was ever in special classes as a child. Is that subsidiary finding a fact wrong? He was in remedial classes, not special ed classes. What does that mean? What's the difference between remedial and special ed? Special ed is a term that we use in the United States. It's not necessarily a term that's used in other countries. I understand, but the remedial classes Mr. Scheer was referring to were in Miami-Dade County schools. And your point is that I've seen where even in colleges, students who were admitted to college have to take, say, a remedial class in some math or English or something like that because they're intelligent enough to be in college, but maybe they didn't get the best preparation in high school. So they need to take some remedial class to get up to speed to what the minimum baseline is. So it could be that kind of remedial class? Yes, and you have to remember that Frankie came from another country, was put into United States schools, and may have had to catch up on grammar or math or something like that. To be put in a special education section involves professionals interviewing him, giving him IQ tests, assessing his needs, essentially putting forth what's called an IEP. None of that exists in Frankie's school records. And so it was valid for the circuit court, the state circuit court, to say there's no evidence that he was in any special classes. Okay, you've answered my question on that subsidiary point, thank you. And I was wondering, you said you had another one? If I did, I forgot what it was. Bottom line, it's not up to the states to rule out the possibility of intellectual disability given a range of 70 to 80. It's up to Frankie to meet his burden. The state courts did do a holistic review, looked at all the necessary elements that go into diagnosing intellectual disability. Can I ask you a question, playing off of the Chief's question about Hall and Moore? In a case, and I know we've held that neither Hall nor Moore is retroactive, but in a case where the relevant state court decision postdates Hall and Moore, and discusses Hall and Moore, does it make any sense for us to excise Hall and Moore out of the equation, legally, not practically? That is up to this court. I'm asking for help. There are non-habeas cases like Landgraf where the court says when you do retroactivity analysis, you've got to figure out the point at which retroactivity matters. So what's the event that you have to figure out retroactivity about? And for AEDPA purposes, if the relevant event is the state court decision that's being reviewed, and that state court decision comes after Moore and certainly after Hall, do we take those into account? Mr. Scher seems to me to be, I think he was trying to walk a very fine line in his brief, because he was trying to follow what we said in the COA, but also try to explain delicately that it doesn't make much sense to him that we're reviewing an opinion under AEDPA deference that addresses Hall and Moore, and we are ignoring Hall and Moore. Again, I'm not sure that it makes any difference in this case, but for analytical purposes, what do we do? What should we do? Well, I think the cleanest thing to do legally would be since this case was final before Hall and Moore, then you should not apply them legally. But here's the twist on that. Finality of his conviction and sentence have nothing to do with the mental disability decision. You understand? Normally, like Teague was decided in a scenario where you were talking about rules, constitutional rules of criminal procedure that affect conviction or sentence. And that's why the finality of the conviction, once direct appeal is done, is the point for determining retroactivity or non-retroactivity. But here, this doesn't go to the validity of the conviction, right? That's correct. Well, where do we peg finality for purposes of retroactivity here? The analogy is... The state's position is it really doesn't matter in this case because he can't meet his burden under Atkins, Hall, or Moore. I know that doesn't really answer your question. No, no, that's a fair answer. From a litigant's perspective, that's certainly a fair answer. We do that all the time ourselves. Let me just give you one more spin about why I'm trying to approach the issue the way that I phrased it. Think of not a mental disability claim, but a mental incompetency claim that arises due to somebody's developing schizophrenia. While they're on death row. That happens a decade after the direct appeal is done. And in that 10-year period, the Supreme Court decides two cases based on mental incompetency standards following up on Ford v. Wainwright. The state Supreme Court, after reviewing a state circuit court decision, finds that the person is mentally competent and can be put to death. Habeas petition ensues. We review. Do we take into account those decisions in that 10-year period on a mental incompetency claim that arises post-finality? I think in that situation, yes, the court would have to do that. Is that because it's about competency to be executed as opposed to be tried and sentenced? Yes, and that is an ongoing evaluation. As your Honor pointed out, it happened while he was in prison, already on death row. If there are no other questions, the state asks this Court to affirm. I don't hear any. Thank you. Mr. Scherr. Thank you. Just a few points. On the last point, I certainly would have been very happy to write the brief if I could at least address Hall and Moore. I'm not comfortable with the state's position that it just really wouldn't matter. Because there's a wealth of case law and language in both of those cases that I believe strengthens. How do you think it would matter? I'm having a hard time understanding how it would matter. Well, because it puts into context, I think. First of all, because Atkins, for example, I was trying to mine some parts of Atkins that would support what otherwise was later adopted in Hall. Let's just assume for purposes of the question that we can consider all of them. How would your argument differ? Well, I think there's, I mean, certainly on all three of the prongs, really. But let's talk to prong one, for example. I mean, this distinction between 70 and 71. I would have a much more, I believe, fulsome argument about why the circuit courts. I mean, Hall and Moore basically say, look, if it's close, you have to go to step two. Correct. Well, the court went to step two, sort of messed it up, in my opinion. But then went to prong three, messed that up. I think Judge Rosenbaum's point is, you might think that there was an error, but it wasn't a Hall error. It wasn't the kind of error that Hall was about. Well, one of the, what I think is one of the most critical parts of Hall, which really is not addressed in Atkins, which I was sort of loathe to get into in the brief, is this idea of a holistic evaluation. I mean, yes, the circuit court went to prong two and prong three. It was ordered to by the Floorspoon Court. But just going one, two, three, without analyzing, I mean, when you have a score, let's even credit 71, yes, you have to go to prong two. Here's the point, okay? The point is Hall and Moore were addressing the problem of a court that just stops at one, and that's not what happened here. Now, you may be, as you're arguing now, is that once it went on to the other factors, you think that the error lies there, but that's not a Hall or Moore error, right? Well, I think it is a Hall error, certainly in terms of the lack of the holistic kind of analysis. The holistic doesn't just mean go to two, three after one. Holistic means they have to be taken together in consideration. That's the whole point of Hall, which is if you have, that's why they struck the 70, which is if you have a 71 or even a 75, you have to go on to number two. And the reason why you have to go on to number two is that you can't rule out an ID case just based on a number that's within the standard error of measure. That's what the court didn't do here. It just independently looked at the three of them, the three prongs in isolation. If you're looking at it holistically, on the other side of the ledger, you've got the majority of experts finding that he's not intellectually disabled. And so if it's a fight between experts, usually that can't constitute clear error. Well, you don't really have that much of a fight. I mean, I sort of disagree with this nine expert. I mean, it really came down to these handful of scores here that we have over the years. No, no. I mean, overall, I'm not talking about identity separating prong one, prong two, prong three. Yet a lot, maybe not every single one. I haven't looked at the record page by page. But a lot of the experts were asked whether or not, in their opinion, after administering all the tests, whether, in their opinion, Mr. Frankie was intellectually disabled. A majority of those experts said no. Well, there was, Dr. Suarez said that. Dr. Tao wasn't tasked with that job. Dr. Toomer said otherwise. But there was at least another expert who said not intellectually disabled. Well, there was Dr. Block Garfield, who didn't testify. She couldn't be located. Her report came at 75. But it's not just a 75. You could have, given what Atkins and his progeny have laid out, you could have someone with a 75, a standard error of measurement leading to a 71 or a 70, and then overwhelming evidence on prongs two and three, and a fact finder could say that person's intellectually disabled. Maybe, but that's not what happened here. That's the problem, is that they were looked at in, that's precisely the problem, is you could have a 75, like I think in Ham, Freddie Hall had higher scores than Mr. Frankie. But when the courts looked at the evidence of the other two prongs in tandem with one, not in isolation from one, the court was able to reach a definitive determination. I mean, I'd be happy to brief Hall and Moore. I mean, Moore talks about this notion that, I mean, the state is relying a lot on evidence presented from death row guards about the facts of the crime. I've been listening carefully, Mr. Sherrod. I think Judge Rosenbaum's question was, how would it make a difference? And what I've heard you say is that it should have been considered holistically. But you say that in your brief, and you've said that already earlier this morning, that it should have been considered holistically. I mean, I don't, I mean, so on the bottom line question, how would it make a difference? It seems, it sounds to me like your argument is exactly the same. Well, he should win. I mean, but I was, I was. Well, no, no, it's not just that. It's not just that there should be a reversal of the denial of habeas relief. It's that the air is failing to consider this evidence holistically. That's what you were saying before. And that's what you're saying now. Well, that's what I'm saying. But Atkins, again, doesn't, you know, I was really walking a fine line. And so there's a wealth of cases, including some from this court, that address all of this in light of Hall and Moore. And so, you know, like I said, I mean, I was accused in the answer brief of trying to undermine the court's COA opinion. And so certainly that wasn't my intention. I don't think I cited the Hall or Moore maybe once just in passing, and I was hoping that they wouldn't notice. But, you know, in terms of some of the other arguments the state is making, I do think I addressed most of them in my reply brief. Dr. Taub didn't mistakenly say the standard error measure was 70 to 80. That was his testimony. He was referring to Dr. Block Garfield's test. I think Dr. Suarez was referring to his view of the standard error measure on his test, the Waste 4 being 71 to 80. In terms of, I addressed this in the reply brief, owned nine cars, that's just not true. The record doesn't bear that out. Again, this notion that he stopped going to school, again, that tracks to the trauma that he suffered. This is when his brother died. All of this was never really considered by the trial court. This sort of lesson that we had about Dade County and how they label remedial schools versus special ed and what's required, none of that is in the record here. All we have is... common experience that there's a difference often between special ed and remedial, and that one does not necessarily mean the other. If we have to at least look at it to see whether something's unreasonable or not, it does not strike me that when the post-conviction court says he was not in special ed classes, that the record necessarily compels a different conclusion. Well, we have the uncle saying he was in Cuba, and number two, the circuit court never addressed it, and so other than making this what was deemed to be an unreasonable finding, and the remedial classes, he got an unsatisfactory grade in the remedial classes, and the remedial classes, as Dr. Suarez pointed out, were in Spanish. So the state's argument to this court that while he just was here, maybe he was uncomfortable with the language and the new culture and all of this stuff, it's just not the case. He got unsatisfactory grades in Spanish remedial classes, whatever you call them, remedial, special ed, whatever it was, he wasn't in the normal classes. I addressed Hall and Moore, so unless the court has any further questions, I'm almost out of my time anyway. I appreciate your time, and we would ask the court to reverse. Thank you, Mr. Scherer, and I know you were court-appointed, and we appreciate you accepting the appointment and discharging your duty this morning, Ably. We're going to be adjourned for today.